## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **TAOFIK OLATUNJI,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:24-cv-1644-N-BN** |
| | § | |
| **AT&T SERVICES, INC.** | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFFS' THIRD AMENDED COMPLAINT AND JURY DEMAND

TO THE HONORABLE David C. Godbey:

Plaintiff Taofik Olatunji presents his Third Amended Complaint for unlawful discrimination based on race and retaliation in violation of 42 U.S.C. § 1981 ("Section 1981") and discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

### I.     NATURE OF THIS ACTION

1. Plaintiff, who worked for Defendant AT&T Services Inc, brings this action to redress race discrimination and retaliation for reporting and opposing race discrimination.

2. Plaintiff brings this action for unlawful discrimination in violation of 42 U.S.C. § 1981 ("Section 1981") against Defendants.

3. Plaintiff asserts violations for unlawful retaliation under Section 1981 for reporting and opposing race discrimination.

*Plaintiffs' Third Amended Complaint and Jury Demand*                    1

4.  Plaintiff further brings this action against Defendant AT&T Services, Inc. ("AT&T" or "Defendant" for discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII").

5.  Plaintiff further brings this action against AT&T for Discrimination by Employer in violation of public policy under Tex. Lab. Code § 21.051

6.  Plaintiff further brings this action against AT&T for retaliation in violation of Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended.

7.  Plaintiff further brings this action against AT&T for Discrimination by Employer in violation of 42 U.S.C. § 1981 prohibition of race discrimination in the making and enforcing of contracts.

8.  Plaintiff is an African American former employee of Defendant who was subjected to one or more aspects of the systemic race discrimination described in this Complaint, including, but not limited to: discriminatory policies, differential treatment; and racial hostility in the workplace. The systemic racial discrimination described in this Complaint has been, and is, continuing in nature.

9.  Plaintiff seeks declaratory and injunctive relief; back pay; front pay; compensatory, nominal and punitive damages; and attorneys' fees, costs and expenses to redress Defendants' pervasive and discriminatory employment policies, practices and procedures.

## II.    PARTIES, JURISDICTION, AND VENUE

4.  Plaintiff Taofik Olatunji ("Plaintiff' or "Olatunji") is an African American male and at all relevant times resided in Dallas, Texas.

5.  Plaintiff presently resides in Dallas, Texas.

6. Defendant, AT&T Services Inc. is a corporation with its principal place of business in Dallas, Texas. Defendant maintains a registered mailing address in Dallas, Texas.

7. Defendant is an employer within the meaning of the relevant laws and statutes.

8. Plaintiff was an employee of Defendant within the meaning of the relevant laws and statutes.

9. Plaintiff was an employee of Defendant at one of Defendant's Dallas, Texas locations.

10. This action arises under federal statutes including Title VII. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C.§ 1331 because the claims brought herein constitute a federal question under the laws of the United States.

11. This is a discrimination suit authorized and instituted pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

12. Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367 for the pendent state claims because they arise out of the same nucleus of operative facts as the federal claims. All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness and convenience for the parties.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Plaintiff was hired to work in this District and Defendant conducts business in this District.

### III.        Exhaustion of Federal Administrative Remedies

14.    Plaintiff filed a Charge of Discrimination on the basis of his race (Charge No. 450-2022-01962) with the Equal Employment Opportunity (EEOC) Commission regarding the defendant's alleged discriminatory conduct on January 26, 2022.

15.    The Equal Employment Opportunity Commission issued a Notice of Right to Sue letter, which Plaintiff received on March 31, 2024, and this Complaint was timely filed within 90 days thereof.

### IV.        GENERAL ALLEGATIONS

16. Olatunji began working for Defendant in October 2014, as a Premises Technician, and started training in Dallas, Texas followed by working in North Richland Hills at 7144 Burns st.

17. Olatunji's job duties included, but were not limited to, installation of internet, television, and phone services, running the service lines to the house, and troubleshooting repairs.

18. Olatunji received annual raises and maintained employment for over 7 years.

19. In January 2020, Nathan Dvorak, a non-African American, became Plaintiffs' manager.

20. Dvorak investigated Plaintiff for his conduct on multiple occasions.

21. Dvorak repeatedly reprimanded or formally disciplined Olatunji over the course two years while he was Olatunji's manager.

*Plaintiffs' Third Amended Complaint and Jury Demand*                    4

22. In 2020, Plaintiff had a meeting with Area Manager Milton Freeman and a Director/3rd Line Manager named Jackie, and Stewart. This meeting was held inside an office at 9110 Autobahn in Dallas, Texas. At this meeting, Olatunji complained about his interactions with supervisor Nathan Dvorak. Union Stuart Alex Doblano was present during this meeting.

23. Plaintiff accused Nathan Dvorak of targeting and harassment during the meeting with Milton Freeman and Director Jackie

24. Plaintiff engaged in protected activity and "opposed or resisted" harassment by complaining about being harassed by Dvorak to Area Manager Milton Freeman and Director Jackie, a 3rd line manager during the aforementioned meeting.

25. Nathan Dvorak sought approval from the Employee Relations Manager to Discipline Plaintiff Taofik Olatunji for an incident that occurred on December 14, 2021, for which Olatunji was later terminated.

26. Dvorak retaliated against Olatunji and caused his termination by asking the Employee Relations manager for permission to discipline Olatunji for an alleged violation of policy, but the proposed reason for termination was a pretext for discrimination, retaliation and disparate treatment.

27. Plaintiff accused Dvorak of targeting and harassment on multiple occasions. These complaints were made to upper management and union representatives.

28. In AT&Ts Position Statement to the EEOC, Dvorak admitted that plaintiff accused him of Harassment on January 5, 2021, in the McDonalds Parking lot.

29. Olatunji's complaints about against Dvorak qualify as Protected Opposition to Harassment and Protected Activity under what the EEOC describes as the Opposition Clause.

30. Olatunji, an African American employee who was supervised by Dvorak (a white male) was reprimanded and/or subjected to disciplinary actions for violation of the AT&T Code of Business Conduct on multiple occasions.

31.  Olatunji's coworker "Dakota" (a white male) engaged in conduct that could potentially be considered as violations of Premises Technician Guidelines and/or the AT&T Code of Business Conduct, while Dakota was under a DML level of discipline, but Dakota was not suspended or terminated for the conduct or misconduct in which he engaged (potential violations of COBC).

32. Several non-African American coworkers of the Plaintiff under Dvoraks' direct supervision, Dakota and Tony, were rarely, if at all, written up or disciplined for similar categories of conduct (violations of the AT&T Code of Business Conduct and/or Premise Technician Guidelines) as Olatunji, an African American was disciplined for.

33. On December 14, 2021, an incident occurred resulting in Olatunji being suspended then subsequently fired for violation of the Code of Business Conduct. Olatunji was accused of misconduct for failure to contact a manager when necessary and Mistreatment of a Customer. Olatunji was accused of mistreating a customer because he did not call the customer or dispatch and drive to that customers home before leaving work for the day. This conduct was classified as Misconduct – Violation of COBC - Code of Business Conduct.

34. Plaintiff did not dispatch on the job because he completed his previous work order after 8 pm and did not typically dispatch on jobs after 8 pm under normal circumstances.

35.  AT&T Premises Technicians seldom dispatch after 8pm. Dispatch after 8 pm is uncommon.

36. The latest available appointment window for Premises Technician service calls is between 4pm – 8pm dispatch time.

37. Years ago, around 2015 or 2016 when when Olatunji worked as an AT&T Technician in North Richland Hills, Texas, at the 7144 Burns location, technicians at that location were briefed on an incident involving a female Premises Technician that fell asleep while driving her company vehicle or personal vehicle at night after completing her assigned jobs as a premises technician. She died from her injuries, so at that time, technicians were advised not to dispatch after 8pm for safety reasons.

38. Dvoraks deviation from policy suggests a Pretext for unlawful discrimination.

39. Nathan Dvorak was direct supervisor to Tony Williams, Jerry Williams, Dakota, and Olatunji starting in January 2020 thru January 2022 with the exception of plaintiff who changed managers in October 2021.

40. Dakota, Tony, Jerry, and Plaintiff were subject to the same employment policies, procedures, and rules.

41. Dakota, Tony, Jerry and Olatunji performed the same or very similar job tasks, including such things as volume, number, weight, and duration.

42. Dakota, Tony, Jerry, and Plaintiff shared the same supervisor Nathan Dvorak for most of the years 2020 and 2021.

43. Dakota, Jerry, and Olatunji had similar disciplinary history because all 3 technicians had been placed on a DML Decision Making Leave while working at the Autobahn location.

44. Jerry, Olatunji, and Tony had similar levels of experience.

45. Plaintiff was qualified enough to maintain employment with AT&T as a Premises Technician for over 7 years.

46. Dakota, Jerry, and Plaintiff engaged in conduct that could be considered a violation of AT&T Rules and Policies.

47. Tony Williams engaged in conduct that could be considered a violation of AT&T Rules and Policies.

48. Dakota, Tony, Jerry, And Plaintiff were in several ways similarly situated employees.

49. At some point between 2019 and 2021 all three employees Dakota, Tony, and Plaintiff were placed under a DML level of Discipline.

50. Olatunji, Jerry Williams, and Dakota were all placed under a DML level of Disciplinary status for violations of company policy, Violations of the Code of Business Conduct and/or Violation of Premises Technician Guidelines.

51. Dvorak was the direct Supervisor of both Dakota and Jerry Williams while they were under a DML,

52. Dakota, Olatunji, Jerry, and Tony all had similar jobs, performed the similar daily duties, worked in the same location, under the same manager, and and were similarly situated in several ways.

*Plaintiffs' Third Amended Complaint and Jury Demand*                    8

53. Dakota was placed under a DML level of disciplinary action after failing to properly secure his electronic devices which may have included his iPad and or JDSU Test Meter.

54. Dakota's misconduct led to his COU device or devices being stolen from a company vehicle during a burglary, leading to a loss of valuable assets, and causing Dakota to be placed under a DML disciplinary step.

55. Olatunji was placed on a DML for failure to properly secure his JDSU Test Meter which was similar to Dakota's reason for being placed on a DML.

56. Dakota and Olatunji were similarly situated employees.

57. Dakota, a white male, was under Direct supervision of Nathan Dvorak a white male.

58. Dakota Violated the AT&T Code of Business Conduct while under a DML.

59. Dakota engaged in activity that could, at Management's discretion, be labeled as misconduct while under a DML.

60. Dakota failed to complete mandatory testing on multiple occasions while under a DML.

61. Dakota failed to complete and upload the WiFi Map Test while dispatched on multiple occasions.

62. Dakota engaged in conduct that, at management's discretion, was subject to disciplinary action while working under the supervision of Nathan Dvorak and while under a DML level of disciplinary status.

63. Dakota Engaged in conduct that could have been considered a violation of the code of business conduct while under a DML.

64. Dakota Engaged in conduct that could be considered a violation of Premises Technician Guidelines while under a DML level of disciplinary status.

65. Dakota failed to complete the WiFi Map Test on several occasions while under a DML.

66. Dakota or any other Premises Technicians' failure to complete the WiFi Map Test to ensure that customers have optimized WiFi coverage within their premises, could be categorized as a form of Customer Mistreatment at managements discretion.

67. Olatunji was fired after misconduct following being placed on a DML, but Dakota was not fired for his misconduct while under a DML prior January 2022.

68. Olatunji was accused, coached, reprimanded and/or formally disciplined by Nathan Dvorak for accusations Customer Mistreatment on multiple occasions.

69. Following being placed under a DML in 2021, Olatunji was not accused of misconduct, reprimanded, nor had any other documented disciplinary issues, prior to December 14, 2021, when Nathan Dvorak initiated the disciplinary actions that led to Plaintiffs Suspension and subsequent termination.

70. Nathan Dvorak, Jerry Williams, Tony Williams, and Dakota are all non-African American, and are outside of the Plaintiff's protected class.

71. Jerry Williams is a non-African American White Male and was under a DML disciplinary status while under direct supervision of Nathan Dvorak, a White Male.

72. Jerry Williams was either coached, investigated, or reprimanded for possible violations of company rules or policies while under a DML.

73. Jerry engaged in conduct that, at management's discretion, was potentially subject to disciplinary action while working under the supervision of Nathan Dvorak and while under a DML level of disciplinary action.

74. Jerry engaged in conduct that could have been considered a violation of the code of business conduct while under a DML.

75. Jerry engaged in conduct that could be considered a violation of Premises Technician Guidelines while under a DML.

76. Jerry Williams was not suspended or fired while under a DML.

77. Jerry Williams was investigated for misconduct while under a DML but was not suspended or terminated as a result of the investigation.

78. Jerry was investigated or coached for failure to follow correct procedure or process while installing a fiber or copper drop wire during installation or repair.

79. Jerry failed to properly bury a portion of the drop at the underground terminal causing a new wire to be installed by the buried wire contractors.

80. Jerry's failure to follow the proper process was considered misconduct and could have potentially caused Jerry to be terminated due to his multiple policy violations and misconduct under a DML.

81. AT&T, Dvorak, and any other decision makers including the Employee Relations Manager did not suspend or terminate Jerry Williams, however Olatunji, an African American was suspended and terminated for misconduct.

82. The conduct Jerry, Dakota, and Olatunji engaged in while under a DML was similar because all three employees' actions would be classified as COBC Code of Business Conduct Violations or Premises Technician Guidelines Violations.

83. Jerry and Olatunji were similarly situated, both on a DML at some point, but Olatunji was subjected to discrimination and disparate treatment as a result of the unequal and adverse disciplinary practices that resulted in his termination.

84. Neither Nathan Dvorak, the Employee Relations Manager or AT&T decided to separate Jerry Williams or Dakota's employment for any reason while these two employees were under a DML prior to January 2022.

85. Dvorak did not seek approval from the Employee Relations Manager to discipline Dakota for misconduct and rule violations while under a DML in the same manner Dvorak did when Olatunji violated rules under a DML on December 14,2021. Dakota was not suspended or terminated for any reason prior to 2022 following being placed on a DML.

86. Dvorak did not seek approval from the Employee Relations Manager to discipline Jerry Williams for misconduct and violations of rules while under a DML, in the same manner Dvorak did when Olatunji violated rules under a DML on December 14,2021. Jerry was not suspended or terminated while under a DML.

87. Dvorak did not to reprimand or formally discipline Dakota for his failure to complete WiFi map tests or other mandatory tests.

*Plaintiffs' Third Amended Complaint and Jury Demand*                    12

88. As a Manger of Premises Technicians, Nathan Dvorak was aware or should have been aware of the completion rates for Mandatory Testing such as the WiFi Map, ABJack Test, and other similar metrics for the employees under his direct supervision. (His crew).

89. Nathan Dvorak asked Plaintiff and technician Pablo to ride together for training purposes one day, and they accompanied each other for several hours while Olatunji repaired services for customers.

90. While Plaintiff and Pablo were together that day, they visited a home that had been previously visited by Premises Technician Tony Williams the prior day.

91. Tony Williams closed a repair ticket for the customer and completed it, rather than placing the repair order in jeopardy status.

92. The customer that Tony Williams visited continued to have service-related issues, and required a next day visit from AT&T. Olatunji repaired the service while on his ride day with Pablo.

93. It was apparent that Tony did not follow proper troubleshooting procedures and failed to climb a telephone pole to repair the service correctly while he was onsite. This behavior would be considered mistreatment of the customer and violation of the Code of Business Conduct, and Violation of Prem Tech Guidelines.

94. Failure by Tony Williams or any other Premises Technicians to follow proper repair procedures while dispatched on a repair ticket is conduct that can, at management discretion, be considered a violation of the code of business conduct, and/or a violation of premises technician guidelines and/or customer mistreatment, or any combination these categories of misconduct.

95. The misconduct mentioned above would or could be subject to disciplinary action up to and including termination.

96. Dvorak (a white male) did not reprimand or discipline Tony Williams (a white male) for misconduct in the above-mentioned incident.

97. AT&T terminated Olatunji for failure to call the customer or manager before leaving work, but this was pretext for unlawful discrimination.

98. Olatunji did not call a manager because Dvorak was the only supervisor available on Duty.

99. Dvorak called and texted Olatunji at 8:44 pm on the Plaintiffs personal phone asking, "Are you going to dispatch on that job that has been assigned since 10 this morning?".

100.      Plaintiff did not want to talk to Dvorak due to a history of Dvorak requiring Plaintiff to drive to customer locations after 9 pm. This could be considered constructive discharge, because Plaintiff would rather risk losing his job than continue to suffer from the discriminatory, disparate treatment, and hostile workplace he suffered from under as a result of Dvoraks targeting and harassment.

101.      Plaintiff was also fearful that Dvorak that would manipulate the situation, and that Plaintiffs' refusal to dispatch would cause him to appear argumentative, or Insubordinate.

102.      Plaintiff had previously informed Dvorak on April 6, 2021, to that he should not contact Plaintiff on his personal phone. Plaintiff texted Dvorak and stated: "Use my company phone if you need to reach me. Don't call or text this one."

after Dvorak texted his personal phone while Plaintiff was at work. Plaintiff believed this behavior to be unwelcome harrasment.

103.     Dispatching after 8pm is uncommon and could potentially place employees in dangerous work conditions due to several factors such a fatigue, crime, and other safety concerns.

104.     Defendant asking Olatunji to dispatch at 8:44 pm could potentially subject Plaintiff to unsafe work conditions because Premises technicians rarely dispatch after 8 pm.

105.     Defendant's reason for termination was a Pretext for unlawful discrimination. Defendants reason for termination was not reasonable because AT&T Premises Technicians seldom dispatch after 8 pm, and some, if not all technicians, have been instructed in the past by AT&T management to refrain from dispatching after 8pm.

106.     AT&T can remove a job from an employee if the employee is unable to dispatch on the job within a reasonable amount of time in relation to the scheduled appointment window.

107.     AT&T can re-assign service orders or repair appointments to the next available technician or try to reschedule a missed service appointment.

108.     On December 14, 2021, a repair job assigned to Olatunji was scheduled for dispatch between 1 pm and 3 pm, and Olatunji did not dispatch on the job prior to 8pm.

109. AT&T had opportunities to remove the job from Olatunji's workload or assign the job to another available technician before releasing everyone go home but did not.

110. Dvorak did not contact Olatunji about the status of the job until after 8pm.

111. AT&T failed to ensure a technician arrived in a timely manner during or near the appointment window.

112. Supervisor Dvorak did not send someone else to complete the job during the appointment window, or as soon as possible after the appointment window.

113. This was pretext for unlawful discrimination and retaliation.

114. Dvorak had options to remove the job from Olatunji but did not.

115. It was not reasonable for AT&T to expect Olatunji to dispatch on the repair ticket after 8pm or reprimand an employee who was unable to dispatch on a work order, because he got stuck at another customer's home while completing an installation order.

116. Dvorak accused Olatunji of customer mistreatment, when in fact, management mistreated the customer by failing to send another available technician to the customer location during the appointment window prior to releasing everyone else except the Plaintiff to go home that day.

117. Dvorak intentionally left the repair ticket on Plaintiff job list rather than remove the job.

118.    Plaintiff believes it was a setup by Nathan in retaliation for Olatunji reporting Nathan for harassment and hostile work environment (protected activity) and a Pretext for discrimination.

119.    Dvorak subjected Olatunji, an African American, to disparate and discriminatory treatment based on race when he reprimanded the Olatunji leading to his subsequent suspension and termination, but failed to discipline Dakota, a non-African American, for multiple violations of the Code of Business Conduct while under a DML disciplinary status.

120.    Nathans' decision to initiate an investigation and formal disciplinary action against the plaintiff was discretionary, yet he chose to escalate the incident causing the Plaintiff to be terminated. This was retaliation for Plaintiffs recent complaints against Dvorak, an adverse employment action, and a pretext for unlawful discrimination.

121.    Disparate treatment had become a pattern due to previous similar incidents.

122.    On 9-16-2020, Nathan documented and admitted that "A manager likely would not have sent him (Olatunji) to a customer apartment after 8pm".

123.    This statement contradicted disparate treatment that Dvorak subjected Olatunji to by directing Plaintiff to dispatch on a repair ticket after 9:15 pm on July 9, 2020, and again suggesting that Olatunji dispatch after 8:44 pm in the December 14, 2021 incident that led to Plaintiffs' termination.

124.    In this incident, on or about July 9, 2020, Dvorak required Olatunji to visit a customer home while not officially dispatched (as required by AT&T policy) after

9:15 pm (even though Olatunji expressed concerns about working that late at night).

125.    Olatunji was not able to successfully dispatch on the repair ticket after multiple attempts, but Dvorak, instructed Olatunji to drive to a customer's home anyway.

126.    Its usually against AT&T policy for Technicians to work at a customer premises while not officially dispatched on a repair, install or helper ticket.

127.    Plaintiff did not leave the customer's home until around 10 pm causing Olatunji to work under disparate and unsafe conditions.

128.    Dvorak was no longer Olatunji's direct supervisor in December 2021, but still chose to reprimand Olatunji for misconduct, which led to Olatunji's subsequent suspension and termination.

129.    Plaintiffs' coworker Dakota, a non-African American who was under a (DML), and under Nathan Dvorak's direct supervision, violated the AT&T Code of Business Conduct, and Violated Premise Technician Guidelines on multiple occasions by failing to complete Mandatory testing at customer locations prior to closing out jobs.

130.    Dakota, a non-African American, was on a (DML) Decision Making Leave which is the final step of discipline before termination but, was not terminated or suspended after multiple failures to complete mandatory testing of WiFi signal strength using the WiFi Map software at customer locations.

131.    Nathan Dvorak treated Dakota more favorably than Olatunji for violations of rules, whether it was intentional or unintentional. The fact remains, disparate treatment occurred.

*Plaintiffs' Third Amended Complaint and Jury Demand*                                                    18

132.    Dakota violated AT&T rules and policies without being suspended or terminated while under a DML.

133.    Dakota benefited from disparate treatment based on race and preferential treatment based on race.

134.    By failing to test customers WiFi signal strength, Dakota mistreated customers and violated policy on multiple occasions without suspension or termination while on a DML.

135.    Olatunji was accused by Dvorak of Customer Mistreatment on multiple occasions and received formal discipline 3 times. The 3rd time Plaintiff was terminated.

136.    Nathan Dvorak initiated an investigation on all 3 incidents which led to disciplinary action for Customer Mistreatment.

137.    Plaintiff denies that he mistreated customers at any time. Plaintiffs alleges the Customer Mistreatment allegations were Pretext for discriminatory disciplinary actions and policy by Nathan Dvorak.

138.    AT&T maintains detailed records of testing results, WiFi maps of customer locations, and disciplinary actions.  Management is routinely notified of technicians' compliance rates, and failure to comply with these policies and procedures. Failure by a technician to complete mandatory testing while dispatched on an installation or repair ticket can be considered a Violation of the Premises Technician Guidelines and/or Code of Business Conduct, and is potentially subject to disciplinary actions up to, and including termination.

139.    Nathan Dvorak failed to discipline Dakota, a non-African American, for clear violations of company policy and rules while Dakota was on a DML (final

step of discipline), but held the Plaintiff, an African-American, to a discriminatory standard by repeatedly scrutinizing, reprimanding , investigating, punishing, harassing, and finally causing the termination of Olatunji .

140.    Failure by Dakota, a non-African American, to ensure that customers had optimized WiFi coverage on repair and/or installation orders could potentially be deemed a violation of the Code of Business Conduct and AT&T Premises Technician Guidelines and is subject to disciplinary action at management's discretion.

141.    Not completing the mandatory WIFI Map Test to ensure customers have good signal coverage could be considered Customer Mistreatment (at Management discretion) and subject to formal steps of discipline, however Dakota was not suspended or terminated for his failures to complete the mandatory WIFI Map Tests, even though Dakota was under the final step of disciplinary action, a DML (Decision Making Leave).

142.    Dvorak, a non-African American treated Dakota a non-African American with preferential treatment compared to Plaintiff, an African American.

143.    Dvorak investigated and reprimanded the Olatunji for failing to send a picture of his truck at the end of the night, but failed to discipline Dakota, a non-African American, for failing to complete mandatory testing on multiple occasions, even though both employees were of a similar situated status.

144.    Olatunji, an African American, was suspended then fired the 1st time he was accused of breaking a rule following being placed under a DML, however the Dakota's violations of the Premises Technician Guidelines and Code of Business Conduct did result in termination.

*Plaintiffs' Third Amended Complaint and Jury Demand*                    20

145.    In the past, failure to run just one test would sometimes lead to a technician being reprimanded, investigated, and/or formal disciplinary action.

146.    On January 5, 2021, Dvorak falsely accused Olatunji of Mistreatment of Customers and placed Olatunji on a formal step of discipline for stopping at a restaurant to use the restroom.

147.    Premises Technicians do not need permission or authorization to visit a restroom.

148.    Plaintiff is not aware of any rules that restrict a technician from choosing where he should choose to stop for a restroom visit.

149.    There is no specific route that a technician must adhere to when taking a restroom visit.

150.    It is uncommon for a manager to contest the validity of a restroom visit by a technician.

151.    Technicians are permitted to use the restroom whenever deemed necessary, without contacting a manager.

152.    It is uncommon for a supervisor to physically enter a restroom location to investigate whether the toilets work or if the restroom is out of order when a technician takes a restroom break.

153.    However, Dvorak documented that he stepped inside the McDonald's restaurant and verified the the bathroom was indeed out of order.

154.    In this incident, Plaintiff explained to Dvorak that he was out searching for facilities to install wiring for a customer's circuit, and that he had to make a

routine stop at the nearest public restroom, however Nathan showed up and accused Olatunji of being out of route.

155.    Nathan placed Olatunji on a formal step of discipline, accusing him of customer mistreatment and being out of route. When in fact, Olatunji was just following the work order to drive up the street and connect wires, and taking a routine stop a at a nearby men's room.

156.    Dvorak falsified documentation claiming that Olatunji was out of route and that Olatunji should have been at the customer residence instead of McDonald's, even after Olatunji explained to Dvorak that he was riding around searching for the Cross Connect Box in an unfamiliar rural area of Midlothian which made it difficult for him to locate because the address on the order was not correct.

157.    Olatunji further explained to supervisor Dvorak that he even stopped and searched the Online Pair Gain Database for directions to the facilities to no avail. Plaintiff read in the Pair Gain Database that the facilities could be located near the High School, and proceeded back in that direction, but needed to stop at the restroom. Plaintiff explained to Dvorak that he then stopped to use the restroom.

158.    Dvorak tracked down Olatunji and found him at the Restaurant where he had driven to take a restroom visit, interrupted Olatunji while he was attempting to use the men's room and proceeded to interrogate Plaintiff about why he chose to park at the McDonald's instead of the Whataburger.

159.    This line of questioning was humiliating, degrading, and plaintiff felt he was being racially profiled.

160.    Olatunji accused Dvorak of Harrassment face to face that day.

161.     Dvorak even went inside the McDonald's to verify that the bathroom stall was out of order after Plaintiff explained that it was his reason for being parked at McDonalds while inside the Whataburger for a restroom break.

162.     Plaintiff was so stressed out by this incident, that he went home for the day and did not return to work for two months due to anxiety disorder caused by Dvorak's persistent targeting and harassment and hostile workplace.

163.     Dvorak's actions subjected Plaintiff to disparate treatment and discriminatory disciplinary actions because Dvorak did not investigate or punish non-African Americans for taking restroom visits.

164.     Plaintiff was subjected to disparate treatment for routine daily work activities (for example driving around in search of facilities to connect wiring.)

165.     On one occasion a white coworker (comparator) of Plaintiff, nicknamed Tony (last name Williams possibly) mistreated a customer by failing to climb a telephone pole to repair a wire, causing a next day repeat service call and loss of service for an additional day. Tony falsified records by completing the ticket and documenting that the job was properly repaired, and that service was restored. Instead of holding Tony accountable, performing an investigation, or at least following policy by creating a repair ticket to allow for proper documentation of the incident, Nathan swept ignored Tony's misconduct, and sent Olatunji to repair the service off-record. Dvorak covered up Tony's failure to follow policy and proper process. These actions effectively manipulated performance numbers for both management and the employee Tony. In fact, because Tony did not climb pole and repair the service as Olatunji did the following day, Tony mistreated the customer. But instead of investigating the incident Nathan never even asked Olatunji about what was found at the worksite. This mistreatment of the customer by Plaintiffs comparator Tony was not held to the same level of scrutiny and

discipline as Dvorak subjected Olatunji to. Tony benefited from preferential treatment.

166. Throughout employment at AT&T between 2014 to 2021, Olatunji claims that Dvorak, Christopher St. Andre, and other non-African American managers made a concerted effort to discipline African American employees, terminate, African American employees, or force them into resigning.

167. Upon information and belief, African American wire technicians were terminated at a disproportionate rate throughout the company.

168. On one occasion, while working at some apartments in Downtown Dallas, a Somalian employee divulged to Olatunji that he was in fear of his life, and that he was afraid of multiple white managers at his garage for making racist comments. Olatunji advised the employee to call the hotline to report the racist behavior.

169. Nathan routinely communicated with Olatunji in a hostile and derogatory tone creating a hostile work environment.

170. Dvorak subjected Olatunji to excessive scrutiny.

171. Dvorak followed Olatunji to work sites and humiliated him by investigating the integrity his restroom breaks.

172. Dvorak has forced Olatunji to work in unsafe situations despite plaintiffs' objections.

173. Dvorak has called and sent text messages to Olatunji's personal phone while on duty (instead of contacting his company cell phone) in attempts to find Olatunji in violation of policy.

174.     On 3/4/2021 Dvorak yelled at Olatunji in the presence of multiple witnesses during a disciplinary meeting about the January 5th incident at the McDonalds.

175.     Witnesses include manager Jesse Mendez and Union Steward Michael. This happened inside of Dvoraks office. Olatunji asked Dvorak to stop yelling at him twice. This interaction may have been recorded because it was during an investigatory meeting. This yelling was intimidating to Plaintiff and created a hostile workplace.

176.     Dvorak falsified documentation on Olatunji on multiple occasions and submitted documentation that tarnished his reputation.

177.     Dvorak caused Olatunji to spend a full workday one-on-one with an employee named Pablo (PG7856), even after Olatunji had recently reported to Dvorak that he and Pablo were having issues. This created an unsafe hostile workplace.

178.     Dvoraks' multiple write ups and targeting contributed to Olatunji being placed on Final Step of Disciplinary Action.

179.     As a result of the termination procedure, Olatunji's health insurance (including the health insurance for his family) was abruptly terminated.

180.     The abrupt termination of health insurance caused Olatunji significant stress and anxiety.

181.     As a result of his termination, Olatunji experienced severe emotional distress, including but not limited to stress, anxiety, and difficulty sleeping.

182.     Olatunji now suffers from PTSD (Post Traumatic Stress Syndrome) and continues to have issues with subsequent and current employment and Employers because of the emotional damages he suffered, and continues to suffer from, due to the unlawful discrimination based on race and adverse employment action, caused by Defendant.

183.     On July 10, 2020, Dvorak, a non-African American supervisor, followed Olatunji, an African American employee, to a worksite and took photos of him without his knowledge. He also then showed the photos to Olatunji and stated that the photos were taken 20 minutes apart. This behavior was troubling, unwelcome, disturbing, and stressful on Plaintiff. This was disparate treatment and harassment.

184.     Nathan has no documented instances in which he followed any Non-African American employees a location where that employee claimed to be on a restroom break, accusing them of being out of route.

185.     Nathan has seldom if ever placed any non-African American employees on a step of discipline for using the restroom, or for being "out of route."

186.     Olatunji, an African American, received a negative survey, and as a result, Nathan performed an investigation and placed Olatunji on a Formal Step of Discipline, accusing him of Customer Mistreatment and Failure to Follow Billing Policy.

187.     Nathan has seldom if ever placed any non-African American employees on a step of discipline for Failure to Follow Billing Policy.

188.    Nathan never placed Dakota or Tony, two non-African Americans coworkers of Olatunji, on a step of discipline for a negative survey or failure to Follow Billing Policy prior to Plaintiff's termination.

189.    Olatunji is African American and was subjected to race discrimination by the Defendant.

190.    Because of Defendant's policy of discrimination, Olatunji was terminated because of his race.

191.    Plaintiff is African American and was retaliated on for protected activity complaints about harassment and discrimination and opposition to discrimination.

192.    Defendants treated African Americans differently than non-African American employees and subjected them to a hostile work environment.

193.    Defendant discharged Taofik Olatunji.

194.    AT&T allowed Dvorak to create a Hostile workplace even after Olatunji engaged in protected activity by opposing discrimination and reporting Nathan for his unlawful harassment.

195.    AT&T had a pattern and practice of discrimination against African American employees.

196.    Defendant monitored and scrutinized Olatunji, an African American more closely than non-African American employees.

197.    Olatunji, an African American, was written up or reprimanded for conduct which non-African American employees could engage in without penalty. (For example, driving to the restroom while dispatched, or driving around in search of

facilities, a routine action required to complete service orders or repair tickets.) When plaintiff engaged in these activities, Dvorak wrote Olatunji for false reasons and claimed he was out of route and mistreating customers. This was a pretext for disparate treatment.

198.    Dvorak's preferential treatment non-African Americans, led to discriminatory and disparate treatment of Plaintiff, and caused his termination, an adverse action.

199.    Olatunji complained of targeting by Nathan Dvorak to Area Manager Milton Freeman and the 2nd line Manager, a female Director named Jackie, during a meeting in Jackie's Office at the 9110 Autobahn Location. This meeting was witnessed by Union Stuart Alex Doblano.

200.    On August 8, 2020, Olatunji called the AT&T Hotline to report another non-African American supervisor, Adam Hayward for misconduct. Olatunji reported unfair treatment after Adam yelled at him and accused him of several false allegations.

201.    Adam Hayward resigned from his job at AT&T less than a month later.

202.    These incidents display a pattern of hostile work conditions at AT&Ts 9110 Autobahn location, and AT&Ts failure to effectively remedy the misconduct displayed by Managers and Supervisors at that location.

203.    In the past Olatunji also called the hotline to report manager Christopher St. Andre for Hostile Work Environment, Targeting, and Harassment. He also resigned from his position within a short period of time. Complaints of manger misconduct are common at AT&T.

## FIRST CLAIM FOR RELIEF
### Discrimination on the Basis of Race
### Violation of Title VII of the Civil Rights Act of 1964, as amended

204.    The allegations contained in the foregoing paragraphs are incorporated by reference herein.

205.    At all times relevant to this action, Plaintiff was an "employee" covered by the protections of Title VII of the Civil Rights Act of 1964 within the meaning of 42 U.S.C. § 2000e(f).

206.    At all relevant times herein, Defendant employed at least 15 employees at all relevant times and is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

207.    In doing the acts alleged above and herein, Defendant discriminated against Plaintiff on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq.

208.    Defendant's discriminatory actions included, but were not limited to (1) limiting, segregating, or classifying Plaintiff in a way that adversely affected his opportunities or status as an employee because of his race; (2) utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of his race; (3) singling Plaintiff out for disparate and harsher treatment because of his race; and (4) discharging Plaintiff based on his race.

209.    As a direct and proximate result of said conduct, Plaintiff has suffered lost past and future wages and job benefits and has suffered and will continue to suffer emotional pain, suffering, inconvenience, embarrassment, mental anguish, and other non-pecuniary losses in an amount to be determined at trial.

## V.                    SECOND CLAIM FOR RELIEF

### Discrimination By Employer in violation of public policy
### under *Tex. Lab. Code § 21.051*

210.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

211.    Defendant employed at least fifteen (15) employees at all relevant times.

212.    The public policy of Texas, as set forth in Tex. Lab. Code § 21.051 states: An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

**(1)** fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

**(2)** limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

213.    Defendant violated the public policy of Texas as set forth in *Tex. Lab. Code § 21.051*. by terminating Plaintiff because of his race.

214.    Such conduct by Defendant is injurious to the public policy of the state of Texas.

215.    As an actual, proximate, and foreseeable consequence of Defendant's conduct, Plaintiff has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

216.     Defendant's actions were done maliciously, willfully, or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages in an amount to be determined at trial.

217.     Defendant's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

## THIRD CLAIM FOR RELIEF

### Retaliation in Violation of Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended

218.     The allegations contained above are hereby incorporated as if fully stated herein.

219.     AT&T, both through its own actions and the actions of its agents, such as Dvorak, intentionally discriminated against Taofik Olatunji in violation of Title VII by, among other things:

a.  Treating him differently on the basis of his race and color, including subjecting him to a variety of discriminatory adverse disciplinary actions including, harassment, targeting, and unequal scrutiny,  while ignoring the same and similar actions by his (White) comparators Dakota and Tony,  and actions directed toward him because of his race, which culminated in the suspension and termination of his employment with AT&T.

b.  Retaliating against Plaintiff when he dared to report harassment from Supervisor Dvorak to upper management.

## FOURTH CLAIM FOR RELIEF

### Discrimination By Employer in violation of 42 U.S.C. § 1981 prohibition of race

**discrimination in the making and enforcing of contracts.**

220.   Plaintiff claims that Dvorak created a Hostile Work Environment through Harassment and discriminatory targeting.

221.   Plaintiff claims that Dvorak discriminated against Plaintiff in a serious and tangible way with respect to plaintiffs' terms, conditions, and privileges of employment by causing the termination of Plaintiffs employment while treating his comparators with preferential treatment, by failing to discipline those comparators with the same level of scrutiny and frequency. Olatunji claims that he was subjected to harassment by Dvorak and that this harassment was motivated by Olatunji's race.

222.   Dvoraks' conduct was not welcomed by Olatunji.

223.   Dvoraks' discriminatory conduct and failure to equally discipline the non-African American comparators Dakota and Tony for similar conduct was motivated by the fact that Olatunji is African American. Olatunji believed his work environment to be hostile or abusive as a result of Nathan Dvoraks' conduct.

## Fifth Claim for Relief (Section 1981)

224.   Plaintiff alleges that Defendant has discriminated and retaliated against him by treating them differently from and less preferably than similarly situated non-African and non-African American employees and subjecting him to, discriminatory disciplinary procedures, disparate terms and conditions of employment, harassment, hostile work environments, termination, and other forms of discrimination in violation of Section 1981.

225.   Taofik Olatunji alleges that Defendant retaliated against him for reporting and opposing conduct that suggests and infers race discrimination.

226.   Defendants' conduct has been disparate, intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

227.   Defendants' policies and practices have produced a disparate impact against Plaintiff with respect to the terms and conditions of employment that are based upon, result from, and are caused by intentional discrimination.

228.   By reason of the continuous nature of Defendants' discriminatory conduct, persistent throughout the employment of Plaintiff, Plaintiff is entitled to application of the continuing violation doctrine to all of the violations alleged herein.

229.   By reason of the discrimination suffered at Defendants, Plaintiff Is entitled to all legal and equitable remedies available under Section 1981.

230.   Plaintiff may be entitled to damages for retaliation and injunctive relief.

### Jury Demand

**231.   Plaintiff requests a trial by jury to the extent allowed by law.**

### PRAYER FOR RELIEF

Wherefore, Plaintiff Taofik Olatunji respectfully requests that this Court enter judgment in his favor and grant him the following relief:

A. Declaratory judgment that Defendants' employment policies, practices and/or procedures challenged herein are illegal and in violation of Section 1981;

*Plaintiffs' Third Amended Complaint and Jury Demand*

B. A permanent injunction against Defendant and their partners, officers, owners, agents, successors, employees, and representatives and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and race discrimination and retaliation by the Defendant as set forth herein.

C. An Order requiring Defendant to initiate and implement programs that (i) will provide equal employment opportunities for African and African American employees; (ii) will remedy the effects of the Defendants' past and present unlawful employment policies, practices, or procedures; and (iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described.

D. An Order requiring the Defendant to initiate and implement systems of assigning, training, transferring, compensating, and promoting African and African American employees in a non-discriminatory manner.

E. An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (A) through (D) above, which would provide for (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (A) through (D), above;

F. An Order placing or restoring Plaintiff into the job he would now be occupying, but for Defendants' discriminatory and retaliatory policies, practices or procedures;

G. An Order directing Defendant to adjust the wage rates and benefits for the Plaintiff to the level that he would be enjoying but for the Defendants' discriminatory and retaliatory policies, practices and/or procedures;

H. An award of back pay, front pay, lost benefits, preferential rights to

*Plaintiffs' Third Amended Complaint and Jury Demand*                    34

jobs and other damages for lost compensation and job benefits suffered by for the Plaintiff because of Defendant's Violation of 42 U.S.C. § 1981 (Section 1981) in an amount to be determined at trial;

I. An Order awarding Plaintiff damages for Defendant's violation of Title VII of the Civil Rights Act of 1964, including backpay, front pay, lost wages, employment benefits, and any other compensation denied or lost because of Defendant's violation of Title VII of the Civil Rights Act of 1964.

J. An Order awarding Plaintiff compensatory damages for emotional distress, pain and suffering, inconvenience, and/or mental anguish in the amount of Three Million Dollars ($3,000,000.00), exclusive of costs and interest;

K. An Order Awarding Plaintiff punitive damages under Texas Labor Code – LAB § 21.2585 in an amount to be proven at trial;

L. An Order Awarding Plaintiff punitive damages for Defendant's violation of Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended (Retaliation) in an amount to be proven at trial;

M. An Order Awarding Plaintiff punitive damages for Defendants' violations of 42 U.S.C. § 1981 which prohibits race discrimination in the making and enforcing of contracts, In the amount of Seven Million Dollars ($7,000,000).

M. An Order awarding Plaintiff the costs of this action;

N. An Order awarding Plaintiff reasonable attorneys' fees;

O. An Order Awarding Plaintiff pre-judgment and post-judgment interest at the highest rates allowed by law; and

*Plaintiffs' Third Amended Complaint and Jury Demand*                                 35

P. An Order granting any other necessary or appropriate relief to which Plaintiff is entitled under the law.

Q. An award of nominal damages to Plaintiff;

R. Such other and further relief as the Court may deem just and proper;

And

S. Retention of jurisdiction by the Court until such time as the Court is satisfied that the Defendant has remedied the practices complained of herein and are determined to be in full compliance with the law.

**Plaintiff:**
Name Taofik Olatunji
Street Address: 431 Brook Valley Circle
City and County: Dallas, Dallas County
State and Zip Code: Texas 75232
Telephone Number: (214) 207-6798
Email: taofikolatunji@gmail.com

**Defendant:**
Name:  AT&T Services Inc
Street Address:  208 S. Akard Street
City and County: Dallas, Dallas County
State and Zip Code Texas 75202
Telephone Number (210) 821-4105

Respectfully Submitted,

_____/s/ *Taofik O. Olatunji*_____
Taofik Olatunji
431 Brook Valley Circle
Dallas, Texas 75232
(214) 207-6798
taofikolatunji@gmail.com
**Pro Se Plaintiff**

*Plaintiffs' Third Amended Complaint and Jury Demand*                    36

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document has been served via electronic filing on October 12, 2024, to counsel of record.


/s/ *Taofik O. Olatunji*